**HAZELTINE RESEARCH, INC.,**
Plaintiff,

v.

**ZENITH RADIO CORPORATION,**
Defendant.
Civ. A. No. 59–C–1847.

United States District Court
N. D. Illinois, E. D.
Jan. 25, 1965.

---

1. Cardozo, The Nature of the Judicial Process, p. 17.

Thomas C. McConnell and Philip J. Curtis, Francis W. Crotty, Chicago, Ill., Dugald S. McDougall, Chicago, Ill., of counsel, for Zenith Radio Corp., defendant-counterclaimant.

Mason, Kolehmainen, Rathburn & Nyss, Chicago, Ill., Lawrence B. Dodds, Edward A. Ruestow, Little Neck, N. Y., Philip F. La Follette, Madison, Wis., and Francis H. Boos, Jr., Little Neck, N. Y., of counsel, for plaintiff.

AUSTIN, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PART I—FINDINGS OF FACT

I. The Parties, The Action, And The Issues.

1. Plaintiff Hazeltine Research, Inc., an Illinois corporation, is a patent holding and licensing company. Defendant Zenith Radio Corporation, a Delaware corporation, is a manufacturer of radio and television receivers. Both parties have regular and established places of business in Chicago, Illinois, in this District and Division.

2. The complaint alleges a cause of action for patent infringement, and the jurisdiction of this Court arises from the patent laws of the United States. The venue is properly laid in this District and Division.

3. The patent in suit is United States Letters Patent No. 2,547,648, entitled "Automatic Contrast Control System For Television Apparatus", issued to plaintiff on April 3, 1951, as the assignee of Arthur V. Loughren. Plaintiff has owned the Loughren patent at all times since its issuance. It was granted on an application, Serial No. 120,404, filed in the United States Patent Office on October 8, 1949. That application is asserted by plaintiff to be a "continuation" of a prior application, Serial No. 643,287, filed on January 25, 1946. On the basis of that assertion, plaintiff contends that the 1949 application is legally entitled to the 1946 filing date of the earlier one. Defendant challenges this position, asserting that the 1949 application was not truly a "continuation" and hence not legally entitled to the 1946 date.

4. Defendant is charged with having infringed claims 1, 2, and 4 of the patent in suit, the accused products being television receivers made and sold by defendant. All three of those claims were first submitted to the Patent Office in the aforementioned 1949 application, Serial No. 120,404. None of the claims carried forward from plaintiff's 1946 application is involved in the case.

5. Defendant denies having infringed plaintiff's patent, and it further avers that, in any event, plaintiff's claims in suit are invalid. The invalidity defense rests on these two independent grounds:

(a) Defendant asserts that the patent in suit, insofar as the claims alleged to be infringed are concerned, has an effective filing date of October 8, 1949, when the second application was filed, and that the claims in suit are accordingly invalid by reason of publication of their subject matter, and public use and sale thereof in this country, more than one year before the filing date of the patent.

(b) Defendant asserts that the claims in suit are void, regardless of their effective filing date, for failure to describe any invention patentable over the prior art.

Defendant also pleaded that the patent in suit is unenforceable by reason of its misuse by plaintiff. This defense, however, was reserved for separate trial, along with defendant's counterclaim seeking damages from plaintiff for antitrust law violations.

II. Facts Concerning Electrical Concepts And Circuit Elements Involved In The Case.

6. The term "current", in the electrical sense, refers to movement of electric charges. There are two types of electrical charge—positive and negative—but normally only negative charges (known as electrons) are mobile, and in consequence electric current nearly always consists of a flow of electrons. It is a characteristic of electric currents that they can flow only in a closed path or loop, and such a closed path is known in electrical parlance as a "circuit". A simple circuit may consist of only a single loop; more complex circuits may involve several interconnected loops.

7. There are two basic types of electric current, known respectively as "direct current" and "alternating current". A direct current is one that flows around a circuit in only one direction, whereas an alternating current is one which periodically reverses its direction of flow. In television circuits, the currents are often of complex character, involving both direct-current components and alternating-current components.

8. The force that makes current flow in a circuit is commonly called "voltage" or "potential"; it may be thought of as electrical "pressure", analogous in some respects to hydraulic pressure. Voltage results from the fact that unlike electric charges exert an attractive force on one another, while like charges exert on one another a corresponding repelling force. Anything that will cause a non-uniform distribution of electric charge in an object will create a voltage, and such voltage will produce an electric current if an electrical conductor is provided to complete a circuit between the oppositely charged portions of the object. The common chemical battery is one familiar type of voltage-generating device.

9. Voltage is commonly measured from one point in a circuit with respect to some reference point in the same circuit. In television equipment, the reference point most commonly used is the metal chassis on which the parts are mounted, and this is usually called "ground", even though in practice there may be no actual conductor joining the metal chassis to the earth.

10. A "resistor" is an electric circuit element intentionally designed to offer resistance to the flow of electric current through it, the amount of such resistance being measured in terms of a unit called the "ohm". When current flows through a resistor, a voltage proportional in magnitude to that of the current appears across the resistor's terminals. Accordingly, in addition to being used for other purposes, resistors are often employed in television apparatus to derive from a varying signal current a proportionally varying signal voltage. When thus used, a resistor may be called an "impedance" or "load impedance".

11. A "capacitor" is an electric device having the property of storing electric charge, analogous in some ways to an elevated water tank. When connected in a circuit with a direct-voltage source, a capacitor will accumulate charge from the source until the stored charge produces a counter-voltage equal to the source voltage. If a charged capacitor is connected into a conductive circuit, it will act temporarily as a voltage source and drive current around the circuit. Because a capacitor, unlike a battery, has no internal means of renewing its charge, however, the voltage of the capacitor will diminish as the current flows and ultimately drop to zero, unless its charge is replenished from some outside source.

12. Of outstanding prominence among the electrical components dealt with in this record are the devices known as "vacuum tubes". Two types are relevant here—the two-element vacuum tube, known as a "diode", and the vacuum tube having three or more elements, generically known as a "grid-controlled tube".

13. A two-element vacuum tube or "diode" consists of an evacuated envelope, usually made of glass, containing one conductive element called a "cathode" and another called an "anode" or "plate". These electrodes are spaced a short distance apart, with a vacuum in between. The cathode is coated with a material having the property, when heated, of giving off electrons (i. e., negative electric charges) in great quantities. When the anode is at a negative voltage with respect to the cathode, these electrons do not go anywhere; they simply form a "cloud" around the cathode. If a voltage source be connected in a circuit with the cathode and anode so as to charge the anode to a positive voltage with respect to the cathode, however, the attractive force exerted by the positive anode will draw the electrons from the cathode across the intervening vacuum and thus create an electric current in the circuit. No electrons will flow through the diode in the other direction, however, even if

the polarity of the voltage source be reversed. Devices, such as diode tubes, which have this property of conducting current in only one direction are known in the electrical art as "rectifiers".

14. A "grid-controlled tube" is a device which, like the diode, has a cathode and an anode enclosed in an evacuated envelope. It has in addition, however, a third electrode called a "grid", situated in the space between the cathode and the anode. This grid is formed of spaced wires which do not, in the mechanical sense, prevent the flow of electron current from the cathode to the anode, but which may, by electric forces, control— i. e., regulate—the rate at which such current flows. If the grid be at the same voltage as the cathode, electron current will flow from the cathode to the anode whenever the anode voltage is positive with respect to the cathode, just as in a diode. If the grid voltage be made negative relative to the cathode, however, the rate of electron flow from cathode to anode will be reduced, and if the grid voltage be made sufficiently negative with respect to the cathode, the electron current between cathode and anode will be cut off entirely. Thus the grid performs a function analogous to that of an adjustable valve in a water hose. Tubes having only one grid are called "triodes", indicating that the tube contains three electrodes. Some tubes have more than one grid and are called "tetrodes", "pentodes", etc., depending on the number of electrodes they contain.

15. All the electrical concepts and circuit elements described in the findings just foregoing were old and well known prior to any of the work on which plaintiff's patent in suit is based.

### III. How Television Pictures Are Transmitted And Received.

16. In a television system, an image of the scene to be televised is projected by a lens system onto the screen of a "camera tube", where the image is "scanned" by a rapidly moving electron beam sweeping across the image from side to side, each sweep being vertically shifted by a small amount from the path of its predecessor, so that the entire image area is progressively traversed. As this electron beam in the camera tube "scans" the image of the scene being televised, its intensity varies in proportion to the brightness of the various parts of the image; in this way, a varying electric current is generated which represents the degree of brightness of the parts of the image progressively scanned. This current (known as "video signal current") is employed at the television broadcasting station to generate radio waves having correspondng intensity variations, and these in turn may be picked up by television receivers within the range of the broadcasting station. The receiver circuits utilize the radio waves to develop a video signal voltage that has intensity variations corresponding in pattern to those of the video signal current generated by the camera tube at the broadcasting station. After being amplified by a circuit in the receiver known as a "video amplifier", this video signal voltage is applied to the receiver picture tube and there used to control the intensity of an electron beam which sweeps systematically across the picture-tube screen, producing thereon a reproduction of the original image televised by the broadcasting station.

17. For the image on the receiver picture tube to correspond to that transmitted by the broadcasting station, the electron beam in the picture tube must "scan" the receiver screen in exact time synchronism with the electron beam in the camera tube. This is accomplished by modulating the radio waves from the broadcasting station with control signals (known as "synchronizing pulses" or, more commonly, "sync pulses") which are used in the receiver to govern the timing of the picture-tube scanning. These sync pulses are of uniform magnitude and occur periodically in the video signal voltage, interspersed in time between the portions representing light and dark areas of the picture. Immediately following each sync pulse is another short-duration voltage pulse that represents the

so-called "black level"—i. e., the amount of signal voltage corresponding to a black area of the picture.

18. The television system used in the United States is of a type known as "negative modulation", in which increasing radio-wave intensity represents darkening, as opposed to brightening, of the transmitted picture. In England, at least until recently, a so-called "positive modulation" system was used, in which increasing wave intensity represented an increase in picture brightness—i. e., the converse of the negative-modulation system. Both these types of television systems were known, and their characteristics understood, long before the work underlying plaintiff's patent in suit was done. (R. 93, 95–96, 103)

IV. Automatic Gain-Control Circuits—
Their Purpose, History, and Basic Operating Principles.

19. To do its work well, the picture tube of a television receiver should be supplied with a video signal voltage of reasonably uniform intensity—that is, the range of video signal voltage defining the spread from white to black should be essentially the same whether the receiver is tuned to a powerful station or a weaker one, and notwithstanding changes in atmospheric conditions affecting the strength of the received radio waves. In television receivers, this is achieved by means of circuits known, interchangeably, as "automatic gain control" or "automatic contrast control" circuits. These names are frequently shortened to "AGC" and "ACC", respectively. AGC circuits for television receivers have been known since a date long prior to the work which led to the patent in suit. All such circuits—prior-art and contemporary alike—operate on the same basic principle, which involves generating an electrical control voltage proportional to the strength of the received radio waves, such control voltage being then applied to the television receiver circuits in such a way as automatically to reduce the amplification when the received signal grows in strength and increase it when the received signal weakens. Hence a video signal voltage of substantially uniform intensity is obtained for operation of the picture tube, despite wide variations in the strength of the radio waves that bring the television signal to the receiver. (R. 74, 153, 275)

20. Even before television, AGC circuits were known and used in connection with sound radio receivers. These two branches of the radio art—sound radio and television—are so related historically and professionally that a skilled worker designing an AGC circuit for television could reasonably be expected to consult the literature on sound-receiver AGC circuits as a source of ideas. Plaintiff's expert witness conceded this. (R. 1446)

21. Numerous television AGC circuits —some of them simple and some of them rather complex—had been developed before the work underlying the patent in suit was done. While these circuits varied greatly in their details, they all had in common the development of the AGC control voltage in a so-called "integrating load circuit", consisting of a capacitor and a resistor connected in parallel. This old feature has been carried forward into modern AGC circuits and is utilized in all the circuits directly involved in this case. (R. 594–595)

22. In one AGC circuit acknowledged to be prior art, the integrating load circuit was supplied with current fed through a diode rectifier from the so-called "video detector" of the television receiver. This developed across the integrating load circuit a d-c voltage substantially equal to the peak magnitude of the video signal voltage, which, in the negative-modulation television system, was that of the sync pulses. While this AGC system was simple and would work, its control of receiver gain was not as sensitive as might be desired. This deficiency could be overcome by adding a d-c amplifier to raise the magnitude of the AGC voltage before using it to control the receiver gain, but this had the disadvantage of requiring an extra stage of amplicaton in the AGC system. (R. 689, 702–704)

23. The simple AGC circuit just described could not be used with "positive modulation" television signals, because in such signals the peak magnitude would vary with the picture brightness as well as with changes in signal strength. The "black level" portions of positive-modulation television signals were a suitable index of actual signal strength, however, and early television designers accordingly developed AGC systems that were specifically engineered to develop an AGC control voltage proportional to the "black level". This was done by measuring the signal voltage only at those instants of time during which the black-level component was being received, and the circuits which accomplished that result were known, in the engineer's jargon, as "reacher-inners". These circuits, while designed primarily for positive-modulation television, would also work—and equally well—in receiving negative-modulation television pictures. Such circuits were known as early as the 1930's. (R. 221-222)

V. The AGC Circuit Of The Patent In Suit—How It Was Developed And How It Works.

24. The work underlying the patent in suit was undertaken in the fall of 1945, when Arthur V. Loughren, named in the patent in suit as inventor, was in charge of an engineering group in plaintiff's laboratory. Loughren's task at hand was designing a television receiver, and one of the goals desired was an improved AGC system. An engineer named Bailey, in Loughren's group, suggested to Loughren that a more sensitive AGC could be secured if one were to start with the video signal voltage derived from the load impedance of the video amplifier, rather than from the video detector. (This was not a new idea, although Loughren at that time may have thought it was.) Starting with that lead, Loughren developed the AGC circuit of which several variants were illustrated and described in his original patent application. (R. 231-236, 815-816, 1451)

25. The main difficulty to be overcome in designing an AGC circuit that would utilize the signal voltage at the video amplifier load impedance is that the d-c voltage level at that point in a television receiver is positive with respect to ground, whereas the AGC control voltage itself must be negative with respect to ground. Loughren's idea for overcoming this difficulty consisted in offsetting the positive d-c voltage at the video amplifier load impedance by connecting the load impedance in a direct-current series circuit with the conventional components of a simple AGC circuit—i. e., a diode rectifier and an integrating load circuit—and adding into the same circuit a source of voltage that would offset or "buck" the troublesome d-c voltage. This "bucking" voltage, Loughren realized, could be a mere battery, but this was deemed commercially impractical, even though it would work satisfactorily. It then occurred to Loughren that a similar result could be attained by inserting into the direct-current series circuit a source of alternating voltage, of such magnitude and frequency as to offset the d-c voltage during at least some of the periods in which sync pulses were being received. By this means, Loughren reasoned, the AGC diode would be able to conduct on sync pulses and thus develop in the integrating load circuit an AGC control voltage of the desired polarity. This approach was tried out in the laboratory, and it worked. (R. 158, 235-238)

26. Loughren's AGC circuit thus developed was more sensitive than its simple forerunner that operated on video signal voltage taken directly from the video detector, since Loughren's circuit utilized the gain of the video amplifier for AGC purposes. It had, however, certain definite requirements for successful operation, and they were clearly acknowledged in the original patent application filed on Loughren's circuit, in January of 1946. These essential requirements were:

(a) The direct-current series circuit that included the AGC rectifier and the integrating load circuit had to include also at least a portion of the video-

amplier load impedance. (R. 639, 720, 966)

(b) The video signal voltage obtained at the video-amplifier load impedance had to be of negative polarity. (R. 742, 978)

(c) The peak magnitude of the a-c "bucking" voltage introduced into the direct-current series circuit had to be approximately equal to the d-c voltage being "offset", i. e., the d-c voltage at the video-amplifier load impedance. (R. 529–530, 533–534, 716–717)

27. While Loughren's AGC circuit was tested in plaintiff's laboratory with satisfactory results, and was made the subject of a patent application, it never won any commercial recognition. In fact, no television receiver sold in the United States by any commercial manufacturer, so far as plaintiff knows, has ever utilized any of the circuits disclosed in the Loughren patent. Moreover, none of those circuits was ever reported by plaintiff to its patent licensees, although it was plaintiff's practice so to report developments deemed important. (R. 258, 324–325, 370)

**VI. The History Of The Patent In Suit.**

28. Plaintiff's original patent application on Loughren's AGC circuit was filed January 25, 1946. In that application several variants of Loughren's circuit were illustrated and described, with due recognition given to the required conditions for operation noted in Finding 26. All the claims originally filed in that application, and all those subsequently added by amendment, recited explicitly that the rectifier, the integrating load circuit, and at least a part of the video-amplifier load impedance must be connected together in a direct-current series circuit. In short, the original Loughren patent application of 1946 was expressly restricted in its concept, its description, its drawings, and its claims to an AGC system in which that basic requirement was met. No other form of AGC circuit was described, illustrated, suggested, or

claimed in that application. (PL–2, pp. 8–9, 11, 19–32, 49, 50–62)

29. The Patent Office history of the 1946 Loughren application was routine, and the application was formally allowed, with fourteen claims, on August 26, 1949. It never matured into a United States patent, however; instead, it was abandoned by plaintiff after being replaced on October 8, 1949, by the revised application which plaintiff calls a "continuation". (PL–2, pp. 90–91; PL–4, third sheet)

30. The events leading up to plaintiff's abandonment of its 1946 application and its replacement by a revised application began with Radio Corporation of America's publication, on March 15, 1949, of its technical bulletin No. LB–769. In that bulletin RCA published a television AGC circuit that resembled Loughren's circuit in some basic respects wherein both Loughren and RCA had borrowed from the prior art, but was radically different from the Loughren circuit in other respects. The principal differences between Loughren's AGC circuit and that of the RCA bulletin were these:

(a) All the circuits illustrated, described, or suggested in Loughren's 1946 application used a diode rectifier as an AGC tube. The RCA circuit employed no such diode rectifier; its AGC tube was of the grid-controlled type. (PL–1, PL–22, R. 686)

(b) The circuit of Loughren's 1946 application, in all its variants, required that at least a portion of the video-amplifier load impedance be connected in a direct-current series circuit with the diode rectifier and the integrating load circuit. In the RCA circuit no such connections were made; instead, the load impedance of the video amplifier was connected to the grid of the AGC tube and was not connected in a direct-current series circuit with either the AGC tube or the integrating load

circuit. (R. 639, 720, 726, 966, 1104)

(c) Loughren's circuit required, as a condition of successful operation, the use of a video signal voltage that was negatively polarized. The RCA circuit, on the other hand, utilized—and required—a video signal voltage of positive polarity. (R. 632, 742)

(d) The AGC system disclosed in Loughren's 1946 application used an a-c voltage supply which was part of his basic direct-current series circuit and acted as an "offset" to the d-c voltage on the video-amplifier load impedance. The peak magnitude of this a-c voltage in Loughren's system was critical; it had to be approximately equal to the d-c voltage that it was required to offset. In RCA's circuit, on the other hand, an a-c voltage was used, but its magnitude was not critical. Indeed, the only limiting factor on the size of that voltage was the insulation in the AGC tube. (R. 529–530, 533–534, 716–717, 743)

(e) Loughren's AGC circuit had an inherent characteristic of "loading" the video amplifier—i. e., reducing the magnitude of the video signal voltage during periods in which the diode rectifier was conducting. (Stated in the conventional engineering parlance employed both by plaintiff's inventor-witness Loughren and defendant's expert witness Johnson, this loading action of the Loughren circuit on the video amplifier is equivalent to drawing energy from that amplifier to develop the AGC control voltage.) In RCA's circuit, no such inherent loading effect existed. (R. 319–321, 1402)

31. Within a few days after its publication, the RCA bulletin LB–769 came to Loughren's attention, and on March 24, 1949, Loughren sent a memorandum to one of plaintiff's principal officers, calling attention to the report and suggesting that the RCA circuit shown therein be examined in connection with the then-pending Loughren patent application, to determine whether the claims of the application would "dominate" the RCA circuit. Such an examination was made, the conclusion was reached that the Loughren patent application as it then stood did not "dominate" the RCA circuit, and steps directed to achieving such "domination" were initiated. A tentative claim was drafted on September 12, 1949, in language which plaintiff considered broad enough to describe or "read on" the RCA circuit as well as on its own circuit. This draft claim was identified by the same file number that plaintiff used for the original Loughren application, and was numbered "31", the next higher number in the sequence of claims submitted in such original application. Hence it appears that plaintiff for a time was considering submission of this broadened claim in the original Loughren application. Plaintiff soon decided, however, that a new patent application would be necessary to achieve its purpose; the next draft claim that plaintiff prepared, dated September 14, 1949, was numbered "1" and was assigned a new file number. Both draft claims were personally reviewed, and edited in his own handwriting, by the officer of plaintiff who had charge of its patent activities, and the second draft claim was, in addition, reviewed and approved by Loughren himself. One of the draft claims bears the handwritten notation "Broad"; the other has a marginal notation reading "Covers RCA keyed AGC system". (PL–21; PL–22; DX F–1; DX F–2; R. 271, 998–1018)

32. One of the handwritten changes in the second draft claim, made personally by plaintiff's officer, consisted in striking from the text the word "amplifier" and substituting the broader term "repeater". This shows to be unfounded the contention, now made by plaintiff, that the word "repeater" in the claims in

suit should be restrictively interpreted to mean only "amplifier". Plaintiff's choice of "repeater" in preference to "amplifier" was, it is plain, a conscious and deliberate broadening of the claim's scope. (DX F-2; R. 1018)

33. As already noted, every claim presented in the original Loughren application called explicitly for a direct-current series circuit including the rectifier, the integrating load circuit, and "at least a portion" of the video-amplifier load impedance. In the revised claims which plaintiff drafted for the revised Loughren application, that plain and accurate description of Loughren's circuit arrangement was replaced with this recitation:

> " * * * a direct-current series circuit including a rectifier *conductively connected to* said load impedance, an integrating load circuit for said rectifier and means for supplying a periodic potential to said series circuit * * *"

Thus, plaintiff edited out of its new claims the requirement, essential to successful operation of Loughren's circuit, that the direct-current series circuit must include "at least a portion of" the load impedance. (PL-2; DX F-2; PL-4, pp. 19-22)

34. The revised application was filed in the Patent Office on October 8, 1949. It contained, in addition to the fourteen claims previously allowed in the original application, five new claims drafted along the lines above indicated. The specification of the new application was revised, with respect to the original text, by editing out the passages referring to the necessity for including "at least a portion" of the video-amplifier load impedance in the direct-current series circuit. Instead, that feature of Loughren's circuit was characterized, in the new application, as merely permissive or optional. The drawings of the original Loughren application were transferred, without alteration, to the revised application. (R. 1025, 1033; PL-4, pp. 19-22; and compare PL-2, p. 8, lines 10-13, and p. 9, lines 4-9, with PL-4, p. 8, lines 15-27, and p. 9, lines 12-21)

35. The aforementioned differences between the specification of the revised Loughren application and that of the first Loughren application constituted new matter for which no foundation existed in the original text. The feature that was characterized in the revised application as optional was not in fact optional or permissive in respect to the disclosure of the original application; it was, on the contrary, an essential requirement for successful operation of the circuits disclosed. (Plaintiff's expert witness so acknowledged.) The broader claims first submitted in the revised Loughren application were intentionally drafted by plaintiff to embrace concepts and circuit arrangements not disclosed or suggested in the original Loughren text. Their purpose, in fact, was to "dominate" the circuit independently developed by RCA and published by it in March of 1949. (R. 639, 966; PL-21; DX F-1)

36. In the course of the prosecution of the revised application, plaintiff succeeded in securing allowance by the Patent Office of four of the newly added broader claims, and the patent in suit hence issued on April 3, 1951, with eighteen claims—i. e., the four new ones and the fourteen old claims brought forward from the old application. (None of those old claims is here alleged to be infringed.) During the prosecution of the revised application, plaintiff made representations as to the scope and meaning of the new claims which defendant relies on as estoppels. These representations are dealt with hereinafter, in the findings which deal with the issue of infringement.

**VII. Defendant's AGC Circuit Accused Of Infringement—Its Structure, Operation, And Origin.**

37. Plaintiff has chosen defendant's television receiver model 16D21 as representative of the receivers accused of infringement. The full circuit diagram of that receiver is exhibit PL-7, and a sim-

plified diagram of its AGC circuit is exhibit PL–23. The accused AGC system includes a video amplifier, which has a load impedance, identified on PL–23 as resistor R6. The AGC tube is of the grid-controlled type, identified on PL–23 as "1/2V9", and the video-amplifier load impedance is conductively connected to one of the grids of the AGC tube by a network of resistors, resulting in application to that grid of a positively polarized video signal voltage. An a-c voltage supply is connected to the plate of the AGC tube through a capacitor, thus applying thereto a train of positive voltage pulses that occur synchronously with sync pulses in the video signal voltage. The cathode-plate circuit of the AGC tube also contains an integrating load circuit across which the negatively polarized AGC control voltage is developed. The only direct-current series circuit in the accused AGC system is one which includes the cathode-plate path of the AGC tube and the integrating load circuit but does not include either the a-c voltage supply nor any part of the video-amplifier load impedance. (R. 398, 401, 565, 750–753)

38. While defendant's accused AGC circuit differs substantially from both plaintiff's Loughren circuit and that of the RCA bulletin, it has much more in common with the RCA circuit than with the Loughren circuit. Thus, it utilizes a grid-controlled tube rather than a diode, it operates on a positively polarized video signal voltage rather than a negative one, and it has no direct-current series circuit which includes the video amplifier load impedance. Further, the a-c voltage used in the accused circuit is about twice as great in peak magnitude as the d-c voltage on the video-amplifier load impedance and is not critical. All these characteristics represent respects in which the accused AGC system is like the RCA circuit and different from that of Loughren. Moreover, the accused circuit has the further difference from the Loughren circuit that its a-c voltage supply is not connected in a direct-current series circuit with the AGC tube and the

integrating load circuit. To sum up, the accused circuit differs from that of plaintiff's Loughren circuit to an even greater degree than did the 1949 RCA circuit. (R. 437, 747–753, 1104–1105)

39. The record leaves no doubt that defendant's accused circuit was developed independently, without any assistance from, or indebtedness to, plaintiff. The first television receiver marketed by defendant, introduced to its distributors in September, 1948, and sold to the public shortly thereafter, contained an AGC circuit which, the expert witnesses for both parties agreed, was fully equivalent to the now-accused system in structure and operation, differing therefrom only in minor details of no significance for present purposes. That early circuit, moreover, was published by defendant in an instruction manual widely circulated in September, 1948. The earliest date on which plaintiff even claims to have supplied defendant with information on an AGC system was July, 1950, when its technical bulletin No. 7107 (Exhibit PL–19) was published. (R. 364, 818, 904, 1307)

VIII. Facts Bearing On The Defense That Plaintiff's Claims In Suit Are Invalid By Reason Of Prior Publication And Public Use.

40. The revised Loughren patent application of October 8, 1949, on which the patent in suit issued, was not a true "continuation" of the original Loughren application of January 25, 1946. On the contrary, it was drafted and filed by plaintiff for the conscious purpose of securing a broader patent monopoly than the disclosure of the original application afforded foundation for. This was done with the goal of "dominating" an AGC system, developed by RCA and first published in March of 1949, that was outside, and distinct from, the concepts and teachings disclosed and claimed in the original Loughren application of 1946. To provide a foundation for claims broad enough to "dominate" the RCA circuit, plaintiff wrote into the 1949 Loughren specification new matter not disclosed in the original 1946 application. All the

claims here in suit were first presented in the 1949 revised application, and they all depend, as foundation for their asserted scope, upon the new matter added in 1949. Insofar as the claims here in suit are concerned, therefore, the patent in suit is entitled to no filing date earlier than that on which it was actually lodged in the Patent Office, namely, October 8, 1949. (See record references cited to proposed findings Nos. 28–35, supra.)

41. The record establishes beyond doubt that the defendant developed, publicly used, and published, more than one year before October 8, 1949, a television AGC circuit that was fully equivalent, in structure and function, to its AGC circuit herein alleged to infringe. Specific facts concerning this prior knowledge, prior public use, and prior publication by defendant are as follows:

(a) Defendant's first commercial television receiver, designated Model 28F20, was engineered and ready for mass production by mid-September, 1948. (R. 907; DX C–9; DX D–1 to D–3)

(b) In that month, defendant conducted a school, at its place of business in Chicago, to familiarize the service managers of its various distributors with the circuit details and operation of its then-new Model 28F20 television sets, of which specimens had already been manufactured. The school was conducted in three sessions, the first of which ran from September 20 to September 24, 1948, and the second of which ran from September 27 to October 1, 1948. The service managers who attended these first two sessions, more than twenty in all, came from cities scattered throughout the United States and, with but a few exceptions, were employees of independent distributing companies rather than of defendant's subsidiaries. (R. 887, 898, 901; DX D–1 to D–3)

(c) Defendant by that time had already prepared and printed several hundred copies of a printed service manual for its television receiver Model 28F20, and that manual was used as the textbook for the aforementioned school. Copies thereof were distributed to all of the persons who attended the school and were retained by them when, upon completing the course, they returned to their respective companies. That service manual contained a complete wiring diagram of defendant's television receiver Model 28F20, including the AGC circuit that formed a part thereof, and it also contained five paragraphs of descriptive text, captioned "Gated A.G.C.", which described the AGC circuit's operation. (R. 893, 904; DX C–9)

(d) During the school sessions which took place in September of 1948, specimens of defendant's television receivers, Model 28F20, were shown to the persons attending the school and demonstrated to them. Servicing adjustments on various parts of the receiver were demonstrated and explained to the students; specifically, the operation of the AGC circuit was described by the instructor and its adjustment for proper operation was demonstrated. (R. 901–903; DX C–9)

(e) All of these events took place on or prior to October 1, 1948, and more than one year before the filing date of the application on which the patent in suit issued. (R. 898; DX D–1 to D–3)

42. Italian patent No. 429,415, which was a substantial counterpart of the original Loughren United States application, issued on January 24, 1948. The drawings and specification of that Italian patent constituted a disclosure of subject matter within the scope of the claims in suit, published more than eighteen months prior to October 8, 1949, the filing date of the application on which the patent in suit issued. (DX E)

IX. **Facts Bearing On The Defense That Plaintiff's Claims In Suit Are Invalid For Want Of Invention Over The Prior Art.**

43. Defendant contends that the claims in suit, if interpreted broadly enough to embrace the AGC circuit herein alleged to infringe, are invalid for want of invention over the prior art, even if such claims were entitled as a matter of law to the January 25, 1946, filing date of the original Loughren application. This contention rests upon the following grounds:

(a) That the claims in suit, so construed, "read on", and are hence anticipated by, the disclosure of the Hardwick U. S. patent No. 2,307,218, issued in 1943;

(b) That the claims in suit, so construed, define subject matter that was obvious, and hence non-inventive, in view of the disclosure of Beers U. S. patent No. 2,120,999, issued in 1938; and

(c) That the claims in suit, so construed, define subject matter that was obvious, and hence non-inventive, in view of the teachings in Blumlein U. S. patents Nos. 2,307,-375 and 2,224,134, respectively issued in 1943 and 1940, and Holmes U. S. patent No. 2,230,295, issued in 1941. (DX C–1, Tabs 1–3 and 5–6)

44. If given the broad interpretation plaintiff contends for, the claims in suit do "read on" the AGC system shown and described in the Hardwick patent. Defendant's expert witness applied the claims in suit to the Hardwick disclosure and found each element thereof present in Hardwick's circuit. This testimony, which the Court believes, was strongly corroborated by plaintiff's written admission, made before the present litigation started, that "We cannot question but that the Hardwick patent does accomplish generally the same result as Loughren." Plaintiff's expert witness attempted on direct examination to distinguish the claims in suit from the Hardwick disclosure, but his testimony to that effect was effectively negated on cross examination. From his testimony as a whole, it is plain that such distinctions as do exist between Hardwick's disclosure and Loughren's AGC circuit relate to features not recited in the claims in suit and hence not available as grounds for saving the claims from anticipation. (R. 802–808, 1181–1197, 1210–1212, 1475–1503; DX F–6)

45. The Hardwick patent was of record in the Patent Office but was never applied against the Loughren claims by the examiner. Any presumption of validity to be gathered from that fact, however, has been sufficiently overcome by the evidence in this record. Moreover, there is reason to believe from the Patent Office file that the examiner's failure to rely on Hardwick may have stemmed from plaintiff's representation that the ter "rectifier" as used in the claims in suit did not embrace grid-controlled tubes. The AGC tube in the Hardwick circuit was of the grid-controlled type. (R. 800 939–940; PL–4, pages 53–54)

46. Given the broad interpretation which plaintiff insists the claims in suit should have (and must have if they are to cover defendant's accused AGC circuit), they are anticipated by the disclosure of the Hardwick patent and define no invention thereover.

47. The Beers prior-art patent discloses an AGC circuit in the environment of a sound radio receiver. Some circuit changes would be necessary to adapt the Beers circuit for use in a television receiver, but such modifications were of a known and obvious character well within the skill of the art at the time Loughren's work was done. (DX C–1, Tab 1; R. 1456–1457)

48. The similarities between the Beers circuit and defendant's accused AGC circuit are striking. In both circuits a grid-controlled tube is used as the AGC tube; in both an a-c voltage is applied to the plate of the AGC tube, the signal voltage being applied to its grid; and similarly the AGC control voltage is developed in both instances across an integrating load circuit connected in the cathode-plate circuit of the AGC tube. The so-called "voltage offset" function accomplished by the a-c voltage supply in defendant's accused AGC circuit is identical to the corresponding function of the

a-c voltage supply in the Beers circuit. (R. 811–816, 1400–1401)

49. The Beers patent discloses an AGC circuit having all of the structural elements of the claims in suit except for the "direct-current electron tube repeater" which the claims call for. The claims in suit cannot be deemed patentable on the basis of that distinction, however, because the use of such a device was old in AGC circuits long before Loughren, and it performs in Loughren's circuit only its old and customary function. An example of a prior-art AGC circuit thus making use of a "direct-current electron tube repeater" is that shown in Fig. 6 of the Blumlein prior-art patent No. 2,307,-375. (R. 816, 1451–1455, 1458)

50. Apart from the matter of the repeater just alluded to, plaintiff's expert witness was unable to distinguish the accused AGC circuit from that of Beers except by reliance on the fact that Beers' circuit was specifically disclosed in the environment of a sound radio receiver rather than in a television set. Plaintiff's expert witness admitted, moreover, that the modifications necessary to adapt the Beers circuit for use in a television set were of conventional nature and known to skilled workers in the prior art. (R. 1446–1447, 1457–1458)

51. The claims in suit, if construed broadly enough to embrace defendant's accused AGC circuit, define nothing inventive over the teachings of the Beers patent. It is significant in this connection that the Beers patent was not of record in the Patent Office history of the patent in suit. (PL–1)

52. The Blumlein prior-art patent No. 2,307,375 discloses a television-receiver circuit together with several different AGC arrangements, any of which, the specification teaches, may be used with the basic receiver circuit. Among the alternative AGC circuits thus referred to by Blumlein in the '375 patent is the one shown in Fig. 5 of the earlier Blumlein patent No. 2,224,134. When the circuits of these Blumlein patents (both of which were Patent Office references) are thus connected together, an AGC system re-

sults that is essentially like the defendant's accused AGC circuit, save for one difference: In the Blumlein circuit the a-c voltage supply is connected to a grid of the AGC tube, whereas in defendant's circuit the a-c voltage supply is connected to the AGC tube plate. Defendant points out that the Holmes prior-art patent No. 2,230,295 (not a Patent Office reference) taught that the a-c voltage supply in the AGC system could be applied either to the plate or to a grid of the AGC tube. If the Blumlein AGC circuit of the '375 and '134 patents is modified by shifting the a-c voltage supply from the grid to the plate of the AGC tube, the resulting circuit is almost identical to defendant's AGC system. Defendant's expert witness testified that in his opinion persons skilled in the art would be taught by the Holmes patent that the Blumlein circuit could be thus modified, and that defendant's accused AGC circuit could therefore be fairly deemed to be wholly derived from prior-art sources. Plaintiff's expert witness disagreed with that view. Considering the testimony of both men, their cross examination, and the degrees of credibility they respectively inspired, the Court finds the opinion of defendant's expert witness to be the more worthy of belief, and it is accordingly adopted as the finding of the Court. (R. 777–792, 1216–1256, 1287–1293, 1335–1337, 1400–1402)

53. Plaintiff, seeking to discount the force of the Blumlein, Hardwick, and Holmes circuits as prior art, makes the point that they were designed for use with positive-modulation television signals. This is true; however, as plaintiff's expert witness admitted, those selfsame circuits would also work on negative-modulation signals. Moreover, the prior-art literature and the testimony of the expert witnesses establish that the characteristics of both types of television signal were well understood in the art, years before Loughren's work was done. It appears that prior knowledge respecting either system was drawn upon routinely by skilled workers in designing apparatus for use with the other system.

This is strongly confirmed by the fact that the Patent Office freely cited and relied on positive-modulation circuits as pertinent prior art against the Loughren claims, coupled with the significant fact that plaintiff never even suggested to the Patent Office that the prior art could be validly distinguished on the basis of the modulation type for which it was designed. Plaintiff's present contention in this regard is an afterthought lacking in merit. (R. 275, 333, 802, 1290–1291, 1488)

## X. Facts Bearing On The Infringement Issue.

54. Resolution of the infringement issue involves determination of these two underlying factual questions:

(a) Do the claims in suit embrace, within their literal scope, the defendant's AGC circuits?

(b) Are the AGC circuits disclosed in the patent in suit and defendant's accused AGC circuit substantially identical with respect to means employed, mode of operation, and result obtained?

With those factual questions answered, the presence or absence of infringement can be determined by applying established legal principles to the facts.

55. With respect to the literal scope of the claims in suit, the parties are in controversy concerning the meaning of the word "rectifier", which appears as a major element in all of the claims in suit. Plaintiff contends that this term should be interpreted broadly enough to include grid-controlled tubes; defendant insists that it should be limited to tubes of the diode type.

56. The evidence is in sharp conflict as to what "rectifier" means as a technical term in the art. Plaintiff's expert witness testified that the term "rectifier" is commonly used in a sense broad enough to include the grid-controlled AGC tube in defendant's circuit, in which a signal voltage is applied to the grid but no current flows through the grid circuit. Defendant's expert witness, on the other hand, attested that the term "rectifier"

may properly be used only with respect to a device which conducts current more readily in one direction than in the other and hence does not include the grid-controlled tube used in defendant's AGC circuit, in which the grid conducts no current in either direction. Each of the expert witnesses referred to technical publications that supported his own opinion, and those publications are of record as exhibits. (R. 737–738, 749, 982, 985; PL–25–31; DX B–1; DX G–1)

57. The patent in suit and its file history provide the following evidence that the term "rectifier", as used in the patent in suit, was meant in its narrow sense, limited to the diode type of tube:

(a) No kind of rectifier except a diode rectifier is shown in any of the drawings of the patent in suit nor described or even alluded to in the specification. (PL–1)

(b) In both the specification of the original Loughren application filed in 1946 and all the claims that were ever presented therein, it was explicitly stated that the "rectifier" must be connected in a direct-current series circuit with the integrating load circuit and at least a part of the video-amplifier load impedance. This language plaintiff's expert witness acknowledged to be specifically directed to the diode-type rectifier. If "rectifier" had been meant in the broad sense plaintiff now contends for, the language used in the specification would have been inapt. Loughren himself, incidentally, participated personally in the drafting of the original 1946 patent application. (R. 361, 639, 1351–1352; PL–2)

(c) During the prosecution of the claims in suit, the patent examiner rejected them on the basis of the prior-art AGC circuit of the Blumlein patent No. 2,307,375, in which the AGC tubes were of the grid-controlled type. With emphasis by underlining plaintiff assured the Patent Office that the Blumlein prior-art circuit was not a proper

basis for rejecting the claims, for the reason that Blumlein's AGC tubes "do not constitute a rectifier device". Following that representation, the examiner withdrew the Blumlein '375 reference and allowed the claims. (PL–4, pp. 53–54)

58. After weighing the conflicting testimony of the witnesses and considering carefully all the other evidence on the subject, the Court is convinced, and accordingly finds, that the word "rectifier", in the claims in suit, means a diode device and does not embrace within its scope a grid-controlled AGC tube such as defendant employs in the accused AGC circuit. In finding thus, the Court is influenced by the fact that the testimony of defendant's expert witness is entirely harmonious with the position plaintiff itself took prior to the patent's issuance, whereas the testimony of plaintiff's expert is squarely inconsistent with plaintiff's *ante litem* position.

59. Another contested issue involving the language of the claims in suit is whether they call for a circuit in which "means for supplying a periodic potential" (i. e., an a-c voltage supply) is part of a direct-current series circuit that includes also a "rectifier" and an integrating load circuit. Plaintiff admits that claim 4 in suit is thus restricted but contends that claims 1 and 2 in suit are not. (Pl.Br., pp. 28–30)

60. Plaintiff's contention with this regard is inconsistent with the plain meaning of the words and punctuation used. Both claims 1 and 2 call for "a direct-current series circuit including a rectifier * * *, an integrating load circuit * *, *and* means for supplying a periodic potential to said series circuit". In other words, each of claims 1 and 2 calls for a series circuit the components of which are recited in the customary serial form, to-wit: A, B, *and* C. Plaintiff would read the recitation of the third element —i. e., the "means for supplying a periodic potential"—as an independent element not necessarily a part of the series circuit. But this reading is plainly not the correct one. To accept it would leave

the recitation of the series-circuit components in the awkward form "including A, B", with no conjunction joining them. Had the meaning plaintiff now contends for been really intended by the claim draftsman, the language used would have been: " * * * a direct-current series circuit including a rectifier * * * *and* an integrating load circuit * * *; and means for supplying, etc." It is also noteworthy that the two elements of the respective claims that admittedly are independent—namely, the "repeater" and the "series circuit"—are separated by a semicolon, whereas the draftsman used a comma to separate the recital of the "integrating load circuit" from that of the "means for supplying a periodic potential". (PL–1, Cls. 1 and 2)

61. Any remnant of doubt that the language and punctuation of claims 1 and 2 do require a circuit in which the a-c voltage supply is a part of the same direct-current series circuit that includes the rectifier and the integrating load circuit is swept away by the file history of the patent in suit. Plaintiff therein, again with emphasis by underlining, told the Patent Office in unmistakable terms that claim 1 in suit demands an arrangement in which the "periodic potential supply means" (i. e., the a-c voltage supply) "forms a series element of a direct-current series circuit". This commitment by plaintiff applies to claim 2 as well as to claim 1, since the words of the two claims are identical in the passages under consideration. (PL–4, p. 54)

62. From these facts it follows that all three of the claims in suit require by their explicit language an arrangement in which an a-c voltage supply is connected as a series element of a direct-current series circuit which also includes a rectifier and an integrating load circuit.

63. The question whether there is substantial identity between the AGC circuit of the patent and defendant's accused AGC circuit, as to means employed, mode of operation, and result obtained, must be answered "No" on this record. There are certain similarities between the two circuits, but every feature that

they share they have also in common with the prior art. Hence the similarities constitute no evidence of infringement. To the extent that the circuit of the patent differs from the prior art, it differs also, in like or greater degree, from defendant's circuit. The means employed in the two circuits differ substantially and the respective modes of operation are radically different. The results achieved, so far as they are similar, are like the results obtained with prior-art circuits. (R. 686, 791, 1400–1401, 1434–1443)

64. Notwithstanding the fact that defendant's accused AGC circuit does not have a "rectifier" in the sense that term is used in plaintiff's claims, and does not have an a-c voltage supply connected in the manner which the claims demand, plaintiff asserts that the claims should nevertheless be held infringed, by virtue of the doctrine of equivalents. That contention must be rejected. For one thing, the lack of substantial identity between the two circuits as to structure and mode of operation compels the conclusion that they are not equivalent as a matter of ultimate fact. Moreover the file history of the patent in suit, i. e., the circumstances under which the claims were secured from the Patent Office, would make it inequitable to apply the doctrine of equivalents in this case. In arguing for allowance of the claims in suit over the circuit shown in Fig. 6 of the Blumlein '375 patent, plaintiff unequivocally and emphatically restricted the scope of the claims to exclude grid-controlled AGC tubes and to include only circuits in which an a-c voltage supply is connected as a series element of a direct-current series circuit which includes also a rectifier and an integrating load circuit. Having thus secured allowance of the claims in suit, plaintiff may not reverse its field and now repudiate the very representations on the strength of which the claims were granted.

65. Defendant's AGC circuit does not utilize any invention, if any there be, that was contributed to the art by the patent in suit.

## PART II—CONCLUSIONS OF LAW

1. This action charges defendant with infringement of claims 1, 2, and 4 of plaintiff's United States patent No. 2,-547,648. The Court has jurisdiction of the subject matter and the parties, and the venue is properly laid in this District.

2. The patent in suit No. 2,-547,648, so far as it relates to claims 1, 2, and 4 in suit, was first applied for when patent application No. 120,404 was lodged in the Patent Office on October 8, 1949. That application was not a legal continuation of plaintiff's earlier patent application No. 648,287, filed January 25, 1946, and is not legally entitled to a 1946 filing date insofar as the subject matter of claims Nos. 1, 2, and 4 in suit are concerned, because those claims are based on new matter not disclosed in the 1946 application and first presented to the Patent Office on October 8, 1949.

3. Plaintiff's claims in suit Nos. 1, 2, and 4 of patent No. 2,547,648 are invalid and void by virtue of United States Code, Title 35, § 102, because their subject matter was published, and publicly used in this country, more than one year prior to October 8, 1949.

4. Plaintiff's claims in suit Nos. 1, 2, and 4 of patent No. 2,547,648 are invalid and void by virtue of United States Code, Title 35, § 102, because their subject matter was anticipated by the disclosure of Hardwick U. S. patent No. 2,307,218.

5. Plaintiffs' claims in suit Nos. 1, 2, and 4 of patent No. 2,547,648 are invalid and void by virtue of United States Code, Title 35, § 103, because they define no patentable invention in view of the prior art represented by Hardwick U. S. patent No. 2,307,218, Beers U. S. patent No. 2,120,999, Holmes U. S. patent No. 2,230,295, and Blumlein U. S. patents Nos. 2,307,375 and 2,224,134.

6. Even if valid, plaintiff's claims in suit Nos. 1, 2, and 4 of patent No. 2,547,648 have not been infringed by defendant.

7. Plaintiff having failed to establish any cause of action against defendant, the action must be dismissed for want of equity and judgment entered in defendant's favor against plaintiff for defendant's legal costs as provided by law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE ANTITRUST ISSUES RAISED IN THE ANSWER AND COUNTERCLAIM.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court hereby makes the following findings of fact and conclusions of law:

I. The antitrust issues raised in the answer to this patent infringement suit and in the counterclaim for damages and injunctive relief were separately tried following the trial of the patent issues. Defendant in its answer asserted the affirmative defense that plaintiff was misusing its patents, including the patent in suit, in violation of public policy and the Sherman Act (15 U.S.C. §§ 1 and 2) and that it, therefore, came into this court with unclean hands and is therefore barred from receiving any relief in this action. Defendant also filed a counterclaim for damages and injunctive relief pursuant to Rule 13(a) of the Federal Rules of Civil Procedure, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

II. Defendant-Counterclaimant, Zenith Radio Corporation, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 6001 W. Dickens Avenue, Chicago, Illinois, and is now and has been continuously for more than 43 years last past engaged in the development for sale and use and in the manufacture, sale and use of radio apparatus and receiving sets, and since the advent of television, television receiving sets throughout the United States and in foreign commerce, and during said period has built up a large volume of business in manufacturing and selling as the demand therefor has existed and will continue to exist, and in the shipment and sale of such apparatus in commerce between the various states of the United States and in foreign commerce, and said counterclaimant is now and has been engaged in said commerce during all of the period above stated and during all times material to this counterclaim.

III. Counterdefendant, Hazeltine Research, Inc., the party plaintiff in this suit, is an Illinois corporation owned and operated as a wholly owned subsidiary of Hazeltine Corporation, a New York corporation, engaged in the manufacture and sale of electronic equipment and devices. The parties stipulated that for the purposes of this litigation Hazeltine Research, Inc. and its parent, Hazeltine Corporation, would be considered as one entity operating as a patent holding and licensing company, engaged in the exploitation of patent rights in the electronics industry in the United States and in foreign countries. The gross income of the Hazeltine enterprises approximates $47,000,000 per year.

IV. For many years plaintiff has accumulated a large number of patents, domestic and foreign, for use in its patent licensing business in the electronics industry. At the time of the filing of this suit Hazeltine had over five hundred patents and patent applications in its licensing portfolio.

V. Plaintiff's policy in licensing electronics manufacturers in the United States was to grant a so-called standard package license which conferred on the licensees for a five-year period freedom from any charge of infringement under all present as well as future Hazeltine patents issuing during the term of the agreement. Royalties were required to be paid on the licensee's entire production whether its products employed any or none of the Hazeltine patents. The license was in effect a covenant not to sue the licensee or its customers should Hazeltine decide within the license period

that the manufacture and sale of any particular apparatus infringed upon any of its patent rights.

VI. Hazeltine filed numerous patent infringement suits against manufacturers who refused to sign its license agreement.

VII. Prior to the instant controversy, Zenith had the standard Hazeltine package license and in May of 1959, toward the close of the last five-year license period, Hazeltine requested that the license be renewed for another five-year period at the then package rate of $50,000 per year. Zenith refused, contending that it did not require a license under any of the patents in the package and Hazeltine countered by asserting that Zenith was infringing at least four of the Hazeltine patents in the manufacture and sale of monochrome television receivers (at that time Zenith was not manufacturing color receivers). At the same time Hazeltine made an alternative proposal to Zenith, offering to grant a monochrome license in accordance with the following formula:

Any one patent in the package would be licensed at 50% of the royalty rate for the entire package of over 500 patents and patent applications. Any two patents would be licensed at 80% of the package rate. Any three or more patents would be licensed at 100% of the package rate. Hazeltine reserved the right to sue for infringement of any patent not licensed. All licenses would otherwise be subject to all the terms and conditions of the standard package form of license and would require payment of royalties on all production during the five-year term of the license irrespective of whether any patent was employed or not. The license would not cover color television receivers.

Zenith refused to sign either of the proposed agreements and on November 20, 1959 the instant suit was filed.

VIII. With the suit on file and at issue, Hazeltine continued its attempt to persuade Zenith to sign the package license. During the course of discovery proceedings Hazeltine informed Zenith that in addition to the patent in suit, Zenith was infringing at least 9 designated Hazeltine patents and applications in the manufacture and sale of its color television receivers. The old form of standard package license under all the Hazeltine patents was again tendered to Zenith for signature and Zenith again refused to sign it.

IX. On April 11, 1962, Hazeltine submitted to Zenith a license proposal for color television which provided an annual royalty rate of $435,000 merely for the 9 patents asserted and an annual rate of $500,000 for a license under all of Hazeltine's patents and patent applications for color television. However, if the standard package license covering all of Hazeltine's patents, for monochrome as well as color, were signed, the maximum royalty rate would be $150,000, the same as the rate in the Hazeltine-RCA package license (later raised to $200,000). Zenith refused these proposals on the grounds that they were obviously designed to force Zenith to take the package license which it did not want or need; that Zenith could not place itself at a competitive disadvantage by taking a license under only 9 patents at $435,000 a year rather than signing the package license containing all Hazeltine patents at the package rate of $150,000 per year.

X. Hazeltine continued its efforts to persuade Zenith to sign the standard package license before this case could be brought to trial. In March 1963, as the case approached the final pre-trial conference, Hazeltine made the following proposal to Zenith:

It grouped together the nine patents and one application which were claimed by Hazeltine to be employed in the manufacture of Zenith color receivers. It placed a maximum royalty on this package of $275,000 per year but for color receivers only. For the entire package containing all of Hazeltine's then existing patents

for color television, an annual maximum of $300,000 was set and for all present as well as future patents issued during the license period an annual maximum of $310,000 was demanded for color television alone.

In this same license proposal, Hazeltine offered its entire package of present and future patents, unspecified, for both monochrome as well as color receivers for an annual maximum of $200,000.

Under this proposal, a license could be taken, if desired, under only two of the ten patents asserted against Zenith's color receiver but it would bear an annual maximum royalty in excess of $200,000 and would license only color receiver production, whereas the entire package of over 500 patents and applications for both monochrome as well as color receivers would bear an annual maximum of $200,000. This proposal was obviously designed to persuade Zenith to sign the standard package license agreement which it was unwilling to do and presented to Zenith management the following alternatives:

1. Endure trials and possibly appeals on at least nine patents at a total estimated cost of over one million dollars, plus damages in the event any or all of the suits were lost.

2. Take a license under the package of ten patents and applications at a cost of $275,000 per year for color television, or a license under the entire package of existing Hazeltine patents for color television at a cost of $300,000 per year, or at a cost of $310,000 per year a license covering existing and future patents of Hazeltine for color television for a five-year period. In each case Zenith would be obliged to make the royalty payment whether any of the patents licensed was used or not in Zenith's color receiver. This would still leave Zenith's entire monochrome production open to continuous attack by Hazeltine, and plaintiff's counsel had already claimed that Zenith's monochrome receiver infringed at least three patents in addition to the patent in suit.

3. Take a license for color television under two patents selected from the package of ten and pay over $200,000 per year, but this would expose Zenith's color production to the assertion of any or all of the color patents not licensed and would subject its entire monochrome production to the assertion of any of the hundreds of patents in the Hazeltine package.

4. Take the standard package license under all patents and patent applications of Hazeltine, present and future, for both monochrome and color television at an annual maximum of $200,000 per year.

Over a five-year license period it would cost $500,000 to $550,000 more for a license under the small group of ten patents for color television alone than for the entire Hazeltine package covering over 500 patents and applications for monochrome as well as color television. In addition, the full package license would remove the risks of further protracted and expensive litigation or harassment whereas the more expensive license under less than the entire package would leave Zenith and its customers exposed to renewed charges of infringement based on any or all of the remaining hundreds of existing Hazeltine patents as well as all patents issuing during the term of the license. The only practical answer would be to accede to Hazeltine's demand and accept a full package license.

XI. Plaintiff's offer to license any one of its hundreds of patents for monochrome at 50% of the package rate, any two at 80% of that rate and any three or more at the full package rate was an

attempt by economic coercion to force the taking of the package. This is clear from the fact that plaintiff had asserted that Zenith was infringing at least 4 patents in its monochrome receivers. Moreover, the reward demanded by plaintiff for a license under less than the full package of patents is in no way related to the quality of the patents since the price is determined solely by the number of patents chosen and most of the patents in the package are characterized by Hazeltine itself as "insignificant."

XII. In all of its proposals to Zenith, Hazeltine insisted as an alternative to litigation that Zenith for a period of five years pay royalties in large sums based on its entire production of receivers whether or not any Hazeltine patent was employed in any way in its products. Plaintiff thus insists that royalties be paid on admittedly unpatented apparatus.

XIII. As of the date the trial began Defendant had been injured in its business and property as the proximate result of the acts and demands of Hazeltine, referred to above, in the amount of $50,065. Defendant has been forced to make expenditures of money and to use the time of its officers, employees, and counsel to defend against this patent infringement suit and by virtue of Hazeltine's threats of suits on other patents, defendant has been forced to expend substantial amounts of money to investigate the scope and validity of the patents asserted. The injury to Zenith's business was occasioned by the necessity that defendant make a choice among alternatives each of which had an adverse economic effect on its business. It was forced either to cease manufacturing and selling its television receivers, pay tribute with consequent increase in its costs or incur the expenses incident to the defense of protracted patent litigation. Although defendant's choice determined the nature and amount of the resulting damages, it was the necessity of having to choose that occasioned the injury.

XIV. In its counterclaim Zenith also seeks damages and injunctive relief based on plaintiff's conspiratorial activities with foreign cartels or patent pools in England, Canada and Australia which have curtailed Zenith's export business.

## THE BRITISH PATENT POOL.

XV. The dominant radio and electronics companies in Great Britain set up the British Patent Pool into which flow thousands of patents owned or controlled by the members and those affiliated with them in the plan. Among these companies are Electric & Musical Industries Ltd., General Electric Company, Ltd., Marconi's Wireless Telegraph Co. Ltd., Philips Electrical Ltd., Pye Ltd., Murphy Radio Ltd., Rank Cintel Ltd., Standard Telephone & Cables Ltd., Gramophone Co. Ltd., E. K. Cole Ltd., and Cossor Ltd. The Hazeltine inventions and patents have been funneled into the Pool pursuant to an agreement with General Electric Co. Ltd. and the share of the Pool's income allocated to these patents is split between General Electric Co. Ltd. and Hazeltine. Pursuant to this arrangement British inventions controlled by General Electric Co. Ltd. are licensed to Hazeltine for exclusive licensing use in its American territory and are included in its United States package licensing activities. The Hazeltine-General Electric Co. Ltd. exclusive agreements were specifically devised to get the Hazeltine patents into the British Patent Pool in a manner which would provide for G.E.C. maximum bargaining power vis-a-vis the other Pool members on the division of the Pool income.

XVI. Pursuant to these arrangements, General Electric Co. Ltd. on its own behalf and on behalf of Hazeltine entered into successive pooling arrangements with the other members of the British Pool wherein and whereby it was agreed that the Hazeltine patents along with the patents of all of the Pool members be licensed in the territory of Great Britain solely by the Pool and on terms and conditions determined by the members of the Pool. Each of the participating parties in all of the interrelated agreements, including Hazeltine by

virtue of the exclusivity of its joint arrangements with General Electric Co. Ltd., contractually pledged that during the period of the agreements no license would be issued that would permit the export of radio and television receivers from the United States into the British market and that the only license employed by the Pool would be a standard package license limited to local manufacture. Hazeltine has been participating in this plan and arrangement since 1938, is currently participating in it and intends to continue its participation.

XVII. Hazeltine has had full knowledge of the various interrelated agreements under which the Pool operates and has operated and of the purpose and effect of the plan which is to protect the British manufacturers in the Pool against competition from television receivers made in the United States and other countries. Hazeltine contends that it has entered into these arrangements because in that manner it can obtain more income from its English patent properties than it could through its own individual effort.

XVIII. The Pool has always issued one form of license which, like the Hazeltine package license in the United States, covers all of the patents in the Pool and requires payment of royalties on all of the licensees' production whether or not any of the patents are employed. The effect of this plan is to amass all of the patents for assertion against anyone not licensed, to prevent importers or foreign manufacturers from entering the market and to preclude the possibility of any attack by the licensees on the validity of any one patent.

XIX. The policy of the Pool was early stated to be to cooperate in the division of territories provided by the plan and "not knowingly [to] assist any [American] company to sell in England under the protection" of the Pool patents apparatus manufactured in the United States and not licensed under the patents of the Pool's American participants. RCA and General Electric, like Hazeltine, for many years participated in the British Pool. However, as the result of antitrust litigation brought by Zenith and by the Government, RCA and General Electric were forced to cease their partipation in the plan.

XX. Initally the strength of the Pool was drawn from patents on radio receivers and with the advent of television, the power of the Pool became greater than ever. Color television is the most recent innovation in the home entertainment field and Hazeltine has now become an even more important factor in the British combination because of its color television patents which Hazeltine contends has given it a "dominating position" in the color television field.

XXI. For years Zenith made every effort to export home receivers to distributors and dealers in the English market. On each occasion, however, the Pool threatened its distributors until they ceased buying Zenith products and no substantial trade outlets could be found which would risk handling the line since the Pool would not license the sale of imported merchandise.

XXII. As a part of the settlement of antitrust litigation brought against RCA, General Electric and Western Electric, Zenith was in 1957 granted royalty-free world-wide rights under the inventions and patents of these companies and began to ship radios to the British market. The Pool could not assert any of these rights to prevent importation and since all basic radio patents have expired, Zenith has been able for the first time to export to and sell its radio receivers in the English market. This is not true of television apparatus however. The Pool is armed with thousands of patents from the Pool members including the British counterparts of patents asserted by Hazeltine against Zenith in the United States. Zenith has been constrained from entering the British television market by the threat of the assertion against it of pooled patents, although Zenith has successfully engineered sets for the British market and has shipped some to its English distributor with the hope that the injunctive relief sought in this suit

would be granted and business on a commercial scale could be conducted.

XXIII. The manufacture in the United States of receivers for sale to exporters here or directly to importers in England (or in Canada and Australia where corresponding patent pools are operating) would risk further charges by Hazeltine of infringement of the United States patents asserted against Zenith here and Hazeltine, by virtue of its exclusive arrangements with the English companies, is contractually unable to grant a license to manufacture in the United States for export to and sale in England under the British counterparts of its domestic patents. Hazeltine's United States package license expressly states, in compliance with the restrictions involved in the pooling arrangements, that no license is granted under any patent rights of countries foreign to the United States.

XXIV. Hazeltine has always told its licensees in the United States that as a matter of policy it would never collect a second royalty on sets exported to foreign countries "where Hazeltine had complete control over its patent situation" but that with respect to England, Canada, Australia and New Zealand, where Hazeltine patents are included in an industry-wide pool, the American licensees would have to make their own arrangements with such Pools.

**THE PATENT POOL IN CANADA.**

XXV. The patent pool existing in Canada is called Canadian Radio Patents Limited. This organization was formed in 1926 by the General Electric Company of the United States through its subsidiary, Canadian General Electric Co. and by Westinghouse, through its subsidiary, Canadian Westinghouse. The shareholders of Canadian Radio Patents Limited are Canadian General Electric, Canadian Westinghouse, Standard Radio Mfg. Corp. Ltd., the Canadian subsidiary of Philips of Holland, Canadian Marconi and Northern Electric (an affiliate of AT & T and Western Electric). The Pool has been largely made up of Canadian manufacturers (most of which are subsidiaries of American companies) who were and are competitors of Zenith with respect to sales sought to be made in Canada. The Pool for many years has had the exclusive right to sub-license not only the patents of the member companies but also the patents of Hazeltine, RCA and a number of other foreign companies. Since 1943 Hazeltine has been an active participant in the activities of the Pool and has been receiving a substantial share of its profits. The Hazeltine patents go into the Pool pursuant to an exclusive license agreement between Hazeltine and Canadian Radio Patents Limited which grants to the Pool the right to include Hazeltine's Canadian patents, present and future, in its licensing and litigation activities. This arrangement has been extended to a date beyond the filing of the instant counterclaim.

XXVI. The organization, purposes, and functions of the Canadian Pool are, in principle, identical to those of the English Pool. Approximately 5000 patents are amassed for licensing and the only form of license available is strictly limited to manufacture in Canada. It is also a package license under all patents in the Pool and all patents issuing during the term of the license. The chief purpose of the Pool is to protect the manufacturing members and licensees from competition by American or other foreign companies seeking to export their product into Canada.

XXVII. The Pool's campaign against importation of radio and television receivers from the United States is highly organized and effective. Patent agents, investigators and agents of the conspiring companies as well as the Canadian manufacturers and distributors trade associations at the behest of the Pool have systematically policed the market in order to locate and stop the sale of imported receivers and have immediately attacked by infringement suit or threat thereof any dealer found to be selling imported receivers. Warning notices addressed to importers, vendors and users

of radio and television receivers advise the trade and the public that only the products of certain named local manufacturers are licensed by the Pool under "basic patents" and that even "users" of unlicensed products are subject to suit on account of patent infringement. Many advertisements run by the Pool went much further. They contained disparaging statements about imported receivers to the effect that they were cheaply made, unsatisfactory in operation, caused fires and were dangerous to use because of "shock hazard."

XXVIII. Mass attacks in the form of infringement suits were made on dealers found to be selling imported American made radio and television receivers. Suits or the threat of suits effectively prevented dealers from handling American made sets.

XXIX. For many years Zenith attempted to set up distribution for its products in Canada but in every instance where a Canadian distributor began to sell Zenith products he was warned by the Pool to stop and return the merchandise or face expensive infringement litigation. To ward off these attacks Zenith attempted to get a license from the Pool, but in every instance it was advised by the Pool manager that importation would not be permitted and, only local manufacture would be licensed.

XXX. As a part of the settlement in the Zenith litigation against RCA, General Electric and Western Electric which involved the activities of the Canadian Patent Pool, Zenith obtained world-wide rights under the patents of the defendants and having obtained these and other patent licenses permitting importation into Canada, Zenith began late in 1958 to export to and sell in Canada its radio and television products through its Canadian subsidiary, Zenith Radio Corporation of Canada. The manager of the Pool, Brian McConnell, investigated the matter and informed Zenith that in order to continue this business in Canada, Zenith would be required to sign the Pool's standard package license which did not permit importation and that Zenith would have to manufacture in Canada any products it intended to sell there. The Pool manager further informed Zenith that it was infringing at least one of Hazeltine's Canadian patents and that Hazeltine's patents, as well as all of the other patents in the Pool, with the exception of those owned by Westinghouse and General Electric Company, could not be licensed for importation. With respect to the latter two companies, McConnell stated that they had instructed the Pool not to refuse to license their patents for importation. The notices to "importers, vendors or users of radio and television receivers" warning them not to purchase imported sets continued to be run by the Pool despite protests by Zenith. Shortly after the aforesaid demand made on Zenith by the manager of the Canadian Pool, the instant suit was filed.

XXXI. Hazeltine before entering into its exclusive arrangement was fully aware of the purpose and the policy of the Pool to prevent the export of American-made receivers into Canada and has worked very closely with Canadian Radio Patents Limited in its licensing activities and its campaign against importation from the United States.

XXXII. The proofs establish as a fact that in the circumstances of this case the Canadian Patent Act does not require the Pool to refuse to license importation, as contended by plaintiff. Nor does the Act penalize in any way a patentee who licenses for importation where, as in this case, there is being carried on extensive manufacturing in Canada under its patents.

### THE AUSTRALIAN POOL.

XXXIII. The dominant electronics company in Australia and its controlled territory is and for many years has been Amalgamated Wireless (A'sia) Limited (referred to as AWA). A number of the same companies involved in the English and Canadian cartel arrangements set up a Patent Pool in Austrialia identical in principle and purpose to the British and Canadian Pools. The patents of all

of the conspiring companies funnel into the Pool which is known as Australian Radio Technical Services and Patents Company Pty. Limited (commonly called ARTS.) The patents flow into ARTS through AWA, Standard Telephone and Cables Pty. Ltd., N. V. Philips Gloeilampenfabrieken, Electric and Musical Industries Ltd. (owning Marconi's and other rights for Australia), Pye Ltd. and Neutrodyne Proprietary Limited. Neutrodyne is a controlled subsidiary of Hazeltine; the latter company owns seventy percent of its stock.

XXXIV. Under an exclusive license agreement dated September 11, 1928, but still in full force and effect, Neutrodyne is authorized to place all inventions and patents of Hazeltine into the Australian Pool and is required to see to it that all of the requirements, restrictions and provisions of the standard package license of Hazeltine are contained in any pooling license issued thereunder. Sub-licensing rights, existing and future, under all of Hazeltine's inventions have been granted the Australian Pool under this arrangement for 35 years and have been the subject of the only form of license agreement issued by the Pool, a standard package license not referring to any particular patent or invention but to all of the rights of all the conspiring companies. A standard Pool license imposes the restrictions necessary to effectuate the division of territories involved in the over-all arrangements. It requires the licensee to agree not to export or import or sell or offer for sale in Australia any radio or television receiving apparatus not manufactured in Australia. Hazeltine has been fully aware of the Pool's plan and policy not to license for importation and has cooperated with and approved the operation of the Pool with respect to all the Hazeltine Australian patents.

XXXV. The standard package form of Hazeltine license covering all patents subject to licensing by the Pool and requiring royalty payment whether or not any such patent is used in the licensed appartus, is employed by each Pool referred to in these findings and is also used by Hazeltine in the United States in order to prevent attacks by licensees on any of the patents of the participating companies in any of the markets covered by these findings.

## DAMAGES SUSTAINED BY ZENITH.

XXXVI. The foreign commerce of Zenith has been drastically curtailed by the patent Pools in England, Canada and Australia. The damages Zenith has sustained were estimated by experienced officials of Zenith, thoroughly familiar with the business problems and sales potentials in the markets involved. They determined the approximate damages sustained by a thorough study of each of the markets involved and all relevant factors including tariffs, shipping costs and manufacturing problems. Zenith's foreign commerce has been damaged by the Pools in the following amounts during the 4-year statutory damage period:

| | |
|---|---|
| Canada | |
| Television | $5,826,896 |
| Radio | 470,495 |
| England | |
| Television | 8,079,859 |
| Radio | 1,169,067 |
| Australia | |
| Television | 625,786 |
| Radio | 66,769 |
| Total | $16,238,872 |

## CONCLUSIONS OF LAW.

1. The court has jurisdiction to determine the antitrust issues under the provisions of the Act of Congress approved July 2, 1890, entitled "An Act To Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sherman Act.

2. Plaintiff's demands on defendant coupled with the bringing of this suit and the threat to bring other suits on other patents constitute an illegal effort to coerce Defendant into signing the Hazeltine package license.

3. The policy of plaintiff, reflected in the demands made on defendant and action taken against it, was to grant no license unless under all of its hundreds of patents for a fixed royalty, is one of unlawful coercion contrary to public policy.

4. The reward sought by plaintiff from defendant for inventions to be licensed in no way related to the quality of the individual patents and under the package license each patent drew strength from the others, thus unlawfully extending the monopoly of each.

5. Plaintiff's offer to license its patents individually but at royalty rates far in excess of the package rate was never an alternative to its controlling policy to grant defendant a license only under all of its patents. Rather, it was proposed by Hazeltine in the later stages of its negotiations in the instant case to cloak the harshness of the original demand by seemingly meeting the request of defendant in that regard. Although it may be said that the Hazeltine proposals on the surface were offers to treat of individual patents, the design was quite apparent—to force by unlawful coercion the acceptance of unwanted patents. This constituted an illegal extension of the patent monopolies. Whatever may be the asserted reason or attempted justification of Hazeltine, its efforts to compel defendant to accept a package of patents involved the use of one patent or group of patents as a lever to compel the acceptance of a license under others. Such a licensing scheme under applicable decisions of The Supreme Court is illegal and constitutes a misuse of the patents involved.

VI. There is a further feature of Plaintiff's licensing practices that in and of itself constitutes an illegal attempt to extend the patent monopolies. The license agreement, whether it be under a single patent or under Hazeltine's entire patent package, requires the payment of royalties in large sums for a period of five years on the entire production of the licensee whether or not any licensed patent is employed in any way in the licensee's products. Plaintiff's demands that royalties be paid on admittedly unpatented apparatus constitute misuse of its patent rights and plaintiff cannot justify such use of the monopolies of its patents, by arguing the necessities and convenience to it of such a policy. While parties in an arms-length transaction are free to select any royalty base that may suit their mutual convenience, a patentee has no right to demand or force the payment of royalties on unpatented products.

VII. The defense of misuse asserted by defendant is a valid one.

### THE PATENT POOLS.

VIII. Every act in furtherance of a general plan to restrain trade and commerce, foreign or domestic, in violation of the Sherman Act, is illegal regardless of whether such act or acts when standing alone and absent conspiracy could be found to be legal.

IX. It is fundamental that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of conspirators. Acceptance of an invitation to participate in a plan, the necessary consequence of which, if carried out, is to restrain commerce, is sufficient to establish a conspiracy under the Sherman Act. Knowledge of a scheme that illegally restrains trade and participation in the plan with such knowledge is all that is required to establish a conspiracy under the antitrust laws and prior agreements need not be shown to have been made between each and all of the conspirators in order to establish a violation of the Sherman Act.

X. The combinations represented by the patent pools in Canada, England and Australia had as their express purpose the prevention of importation into those markets of radio and television apparatus made in the United States and other countries. Hazeltine knowing of the restrictions against imports imposed by those Pools nevertheless chose to permit its patents to be used in

78

furtherance of the scheme and thereby obtained a substantial share of the Pool's income. It thereby became a coconspirator and legally liable for all the acts of the Pools and its members performed in furtherance of their patent licensing plan to divide markets and prevent competition from imported sets.

 XI. Hazeltine's method of placing its patents in the foreign pools—the use of exclusive license agreements either directly with the Pool as in Canada or through a pool member, as in England, or through a subsidiary, as in Australia —is the traditional means employed in the formation of illegal cartels and it is no defense to say that the particular exclusive licenses to which Hazeltine was a party did not in and of themselves impose the illegal restriction. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts but only by looking at it as a whole.

XII. Hazeltine's defense that it had no intent to restrain trade and that it participated in the Pools for business reason has no legal validity. If good business reasons and expressions of good intent would serve as a defense for restraining trade, the Sherman Act would be rendered impotent and would afford no aid to the free flow of commerce.

XIII. Hazeltine's claimed defense that conspiracies by American companies with companies abroad are governed solely by foreign law and are not violative of the Sherman Act has no legal validity. It is well established that a conspiracy to restrain the domestic or foreign commerce of the United States to which any American company is a party violates the Sherman Act irrespective of the fact that the conduct complained of occurs in whole or in part in foreign countries.

XIV. By virtue of its arrangements in connection with the Pools in Canada, England and Australia, Hazeltine has violated Section 1 of the Sherman Act.

XV. Counterclaimant has established that it has been injured in its business by virtue of the unlawful conspiracy and acts performed in furtherance thereof. As a co-conspirator Hazeltine is liable for those damages.

XVI. Counterclaimant is entitled to the injunctive relief sought in its counterclaim.